**INTERNATIONAL & G. N. R. CO. et al. v. BARNES BROS. et al.   (No. 11706.)***

Court of Civil Apeals of Texas. Fort Worth. March 5, 1927.

Rehearing Denied April 9, 1927.

**1. Carriers ⟜230(13)—Indefinite and conflicting findings held insufficient to support judgment against railroad for injury to cattle shipment.**

In action against railroads .for injuries to cattle shipment, findings which were uncertain, indefinite, and conflicting in material respects *held* wholly insufficient to support judgment for plaintiffs, since verdict must find all issues made by pleading in unequivocal language.

**2. Trial ⟜232(2)—In action submitted on special issues, charge that. railroads were not liable for injury to cattle shipment caused by required dipping or overflow of river held not erroneous as general charge.**

In action against railroads for injuries to cattle shipment, submitted on special issues, instruction that railroads were not liable for injury resulting from dipping required by National Bureau of Animal Industry, or from act of God in unprecedented overflow of river, *held* not error as being in nature of general charge.

**3. Carriers ⟜230(9)—Instruction that railroads were not liable for injury to cattle shipment from required dipping held proper under evidence.**

In action against railroads for injuries to cattle shipment, instruction that defendant was not liable for injuries resulting from dipping of cattle required by National Bureau of Animal Industry *held* proper in view of evidence.

**4. Carriers ⟜230(7)—Instruction that railroads were not liable for injury to cattle shipment from act of God held proper under evidence.**

In action against railroads for injuries to cattle shipment, instruction that defendant was not liable for injury resulting from unprecedented overflow of river since that was act of God *held* proper in view of evidence.

**5. Carriers ⟜230(7)—Instruction that railroads were not liable for injury to cattle shipment caused by required dipping or overflow of river need not require injury to result solely from such causes.**

In action against railroads for injuries to cattle shipment, instruction that defendants were not liable for injury resulting from dipping required by National Bureau of Animal Industry or from act of God in unprecedented overflow of river *held* not erroneous for failure to require such injury to result solely from such causes.

**6. Trial ⟜352(1)—Defendant may have submitted each group of facts constituting defense or reducing damages, and if tried on special issues each integral part may be submitted separately.**

In action against railroads for injury to cattle shipment, defendants may have submitted to jury in affirmative form each fact or group of facts which standing alone constitute defense to negligent acts alleged or would reduce damages, and where case is tried on special issues each integral part of group may be submitted separately.

**7. Trial ⟜350(1)—Converse of issues presented for plaintiff should be presented for defendant.**

In trial of action against railroads for injury to cattle shipment, converse of issues affirmatively presented for plaintiff should be presented for defendant.

**8. Carriers ⟜219(5) — Connecting carriers could apportion liability for injury to cattle shipment between themselves.**

In action against several railroads for injury to cattle shipment, in which there were several separate issues of negligence arising during handling of shipment by each carrier each of which constituted cause of action within itself, defendants had right as between themselves to apportion total damages according to liability.

Appeal from District Court, Cooke County; H. S. Holman, Judge.

Action by Barnes Bros. and another against the International & Great Northern Railroad Company and others. Judgment for plaintiffs, and defendants appeal and plaintiffs file cross-assignments of error. Reversed and remanded.

Terry, Cavin & Mills, of Galveston, and Garnett & Garnett, of Gainesville, for appellants.

J. A. Templeton, of Fort Worth, for appellee.

DUNKLIN, J. The International & Great Northern Railroad Company, the Gulf, Colorado · & Santa Fé Railway Company, and Atchison, Topeka & Santa Fé Railway Company have appealed from a judgment rendered against them jointly and severally in favor of M. E. Barnes, F. A. Barnes, and E. ·D. Barnes, composing the partnership firm of Barnes Bros., and the Security National Bank, for the sum of $3,305 as damages for injuries sustained by cattle owned by Barnes Bros. and transported in two shipments, one from Crockett, Tex., the other from Grapeland, Tex., to Barnsdall, or milepost 181, in the state of Kansas.

The total number of cattle shipped was 299, and they were shipped in the same train. The distance between Crockett and Grapeland is ten miles. Both those stations are in Houston county, Tex. The shipment from Crockett was loaded first, and the cars containing the cattle loaded at Grapeland were taken in the same train when it reached Grapeland coming from Crockett. There were about 197 cattle shipped from Crockett, and about 102 from Grapeland. Both of those stations are on the International & Great Northern Railroad, and that company transported the cat-

---

⟜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted June 4, 1927.

tle to Longview, where they were delivered to the Texas & Pacific Railway Company, which in turn carried them to Fort Worth, Tex., and were transported from Fort Worth over the Gulf, Colorado & Santa Fé Railway Company to the end of its line in the state of Oklahoma, and from there transported to Barnsdall in Kansas over the Atchison, Topeka & Santa Fé Railway Company, Barnsdall being the final destination of the shipment.

The basis of plaintiffs' suit consists in allegations of rough handling of the cattle during transportation, delays en route, and unnecessary unloading at Shawnee, Okl., all of which was alleged to be negligence and on account of which it was alleged a number of the cattle died and the market value of the remainder was depreciated. The total damages claimed by the plaintiffs was $6,985.50.

In addition to a general demurrer and general denial, the defendants filed special pleas in which it was alleged that the cattle were shipped from a tick-infested section of the country, south of the quarantine line, into clean territory north of that line, which fact made it necessary for the cattle to be dipped several times in order to rid them of ticks; that as a result of such dipping the cattle were so weakened and poisoned by the absorption of arsenic used in the dipping that they were not able to withstand the long trip from origin to destination, and that if any of them died or were injured, it was the result of those dippings to which the cattle had been subjected before and during their transportation. It was further alleged that the delay of the shipment at Shawnee, Okl., which was specially pleaded by the plaintiffs, was due to an unprecedented rise in the Arkansas river at Arkansas City, Kan., through which the Atchison, Topeka & Santa Fé line extends, and as the result of such flood, a portion of the track of that company was washed out immediately south of Arkansas City, thereby necessitating a detour of the cattle over another railway line to Barnsdall. The defendants further alleged that any delay in the shipment at Fort Worth was due to the dipping of the cattle at that station under orders of the quarantine officers.

The proof showed that Barnes Bros. purchased the cattle in the vicinity of Crockett and Grapeland for shipment to Barnsdall, Kan. The Crockett cattle were driven into the cattle pens at Crockett about 1 o'clock p. m. on the 7th day of June, 1923; on account of a delay in getting cattle cars, the loading did not begin until 4:30 o'clock p. m. the same afternoon, and the cattle started on their journey at 6 o'clock p. m. When the train bearing the Crockett cattle reached Grapeland the 199 head shipped from the latter station were already loaded, and they were then picked up and both shipments proceeded without delay.

The cattle were dipped for ticks before they were loaded in the pens at Crockett and Grapeland for shipment, and they were again dipped when they reached the Fort Worth stockyards in Fort Worth, Tex., in obedience to the requirement of the quarantine regulations. The shipment was made during the warm season. When the shipment reached Palestine, Tex., on the International & Great Northern Railroad, that company changed the billing so as to route them via Longview. When the Gulf, Colorado & Santa Fé Railway train bearing the cattle reached Shawnee, Okl., three of the cattle were dead and some others were down in the cars, and when unloaded into the pens at that point, some were reeling and staggering. After they were so unloaded, 13 others of the cattle died in the pens. Later, 22 more died in the same pens. Four more died before reaching the destination, Barnsdall, Kan., leaving 257 that reached their destination, which were delivered to plaintiffs, who immediately put them upon pasture. On account of an unprecedented flood prevailing in Arkansas City, Kan., which rendered it unsafe for trains to go over the bridge that spanned the river at that point, it became necessary for the Atchison, Topeka & Santa Fé Railway, who then had charge of the cattle, to detour them from Shawnee to Barnsdall over the Missouri, Kansas & Texas Railway. The cattle remained in the pens at Shawnee, Okl., from 6:45 o'clock p. m. June 10, 1923, until 8:30 o'clock p. m. June 11, 1923, before starting on the Missouri, Kansas & Texas Railway to Barnsdall.

Forty-nine special issues were submitted to the jury, and their answers thereto included findings of some of the facts noted above which were proven by uncontroverted testimony. The remaining facts so found by the jury may be summarized as follows:

1. Specific findings that while the cattle were actually moving they were handled with ordinary care and dispatch from points of origin to Shawnee. And there were no findings by the jury that they were not so handled from Shawnee to Barnsdall, nor was there any such issue submitted.

2. There were negligent delays in starting the cattle from Crockett and in starting them from Palestine to Longview after they had reached Palestine, and in starting them from Fort Worth after they had been dipped in the Fort Worth stockyards, and in starting them out of Shawnee on their way to Barnsdall after it became apparent to the Atchison, Topeka & Santa Fé Railway Company that it could not transport the cattle over its own line from Shawnee to destination; and by reason of said such negligent delays, the cattle suffered injuries which depreciated the market value of the 257 head finally delivered at Barnsdall.

3. The condition and appearance of the cattle while they were in the Fort Worth

stockyards before they were dipped and also when they arrived at Gainesville after leaving Fort Worth was fairly good.

4. Those cattle also suffered injuries by being held in the pens at Shawnee, which depreciated their market value.

5. The 3 head found dead when the train reached Shawnee and 13 head that died after being unloaded in the pens at that station all died as the result of the dippings to which they had been subjected before starting on the trip and in Fort Worth.

6. The deaths of 22 others that died in the same pens and 4 that died en route from Shawnee to Barnsdall, making 26 in all, was caused by the negligence of the defendants.

7. The proximate cause of the condition in which the 257 that were finally delivered, when they reached Barnsdall, was "dipping and delay."

8. Upon the arrival of the 257 head at Barnsdall they appeared to have been burned or poisoned as the result of dipping, and at that time and place the cattle had no other apparent injuries except such as would have been the unavoidable and proximate result of shipment in cars by rail for the distance they had traveled.

9. The dippings of the 257 head received at Fort Worth June 9, 1923, and prior thereto in Houston county, Tex., injured the cattle and was the proximate cause of their condition upon their arrival at Barnsdall at noon June 12, 1923.

10. The cattle sustained injuries by being held in the pens at Shawnee from 6:45 o'clock p. m. June 10, 1923, until 8:30 o'clock p. m. June 11, 1923.

11. In answer to the question whether or not the jury was able to distinguish and determine from the evidence what part of the total injuries sustained by the 257 head was caused solely by the dippings they had received and the injuries which resulted from the cattle being held in the pens at Shawnee for the period of time mentioned above, to which question the jury answered "Yes"; and in answer to a further question they found that approximately one-half of the total damages so sustained was the result of dippings, and the other one-half the result of the negligence of the defendants.

12. The market value of the 257 head delivered at Barnsdall at the time of their arrival was $15 per head. Had they been transported with ordinary care and dispatch, and had arrived at Barnsdall in an uninjured condition, taking into consideration the unavoidable injuries, if any, necessarily incident to the transportation of cattle by rail for the distance they had traveled and the effect of the dippings, if any, their market value would have been $35 per head.

In addition to the findings on special issues, the jury returned a general verdict in favor of the plaintiffs for $3,305, without any instructions from the court to return a general verdict.

[1] Manifestly, the findings of the jury were uncertain and indefinite in many material respects, and in other material respects hopelessly conflicting, and therefore wholly insufficient to serve as a proper basis for the judgment rendered. Those conflicts in the findings upon the issue of the proximate cause of the injuries to the cattle become more apparent in view of the great preponderance of the evidence tending to show that practically all of the injuries suffered by the cattle were the result of arsenic poison in the solutions in which they were dipped. And the assignments of error presenting those contentions must be sustained.

In Moore v. Moore. 67 Tex. 293, 3 S. W. 284, the judgment of the trial court was reversed on account of an insufficient verdict, and in that case Justice Gaines, after referring to the verdict, used this language:

"As to the true construction of such a verdict, neither the lower court nor this court is permitted to speculate. The verdict must find all the issues made by the pleading in language which does not admit of mistake. It should be the end and not the continuation of the controversy."

The rule so announced has been uniformly followed by the appellate courts of this state, some of which apply specially to the facts of this case. Bowdoin v. H. & T. C. Ry. Co. (Tex. Civ. App.) 211 S. W. 538; T. & N. O. Ry. v. Undertaking Co. (Tex. Civ. App.) 218 S. W. 84; West Lumber Co. v. Keen (Tex. Com. App.) 237 S. W. 236; Mayo v. F. W. & D. C. Ry. Co. (Tex. Civ. App.) 234 S. W. 938; Texas Electric Co. v. Burt (Tex. Civ. App.) 272 S. W. 255; Kahn v. Cole (Tex. Civ. App.) 227 S. W. 556; Puckett v. Davis (Tex. Civ. App.) 238 S. W. 367; N. T. T. Co. v. Armour & Co. (Tex. Com. App.) 288 S. W. 145.

We shall not undertake a review of the many decisions cited by the appellee in which assignments of error raising the question of insufficiency of verdicts by reason of alleged conflicting findings were overruled, since the records in those cases were materially different from the record in this case, and the conclusions reached in those cases are not at variance with the rule announced by Judge Gaines in Moore v. Moore. The difference in the different decisions upon the question now under discussion arises solely by reason of the difference in the facts; the question at last being one of application of the rule to the facts of each particular case.

[2-5] By cross-assignments of error, the appellees complain of the trial judge's instructions to the jury that defendants were not liable for any injuries to the cattle that resulted from the dippings because the same were required by the National Bureau of Animal Industry, or for injuries resulting from an unprecedented overflow of the river

at Arkansas City, since that was the act of God, because such instructions were in the nature of a general charge, and were improper because the case was submitted on special issues.

In the decisions cited in support of those assignments, it is held that when a case is submitted on special issues an instruction which is in the nature of a general instruction should not be given because it tends to confuse the jury. The instructions referred to above undoubtedly are correct statements of the law, which the jury must have known in the absence of any instruction thereon from the court, and we are unable to perceive how they could have tended to confuse the jury in their determination of any of the issues submitted to them. Furthermore, they do not purport to be general charges on the whole case, but merely instructions that defendants were not liable for injuries resulting from the causes mentioned, and therefore the authorities cited such as T. & N. O. Ry. v. Harrington (Tex. Com. App.) 235 S. W. 188, have no proper application.

We overrule the appellees' further contentions that neither of these charges was warranted either by the evidence or by the law. The dippings and the fact that the flood mentioned was unprecedented and therefore properly classed as the act of God were established by uncontroverted proof. There is no merit in the further contention that in those instructions the jury should have been told that the injuries therein referred to were confined to such as resulted solely from the cause therein mentioned, unmixed with injuries resulting from the negligence of the defendants. Throughout the special issues the injuries resulting from those different causes were clearly distinguished and separately submitted, and in answer to one issue the jury apportioned the damages which they found resulted from the different causes operating concurrently with each other.

[6, 7] The submission of numerous designated special issues is challenged by another cross-assignment on the ground that they related to mere evidentiary facts, rather than issues, in the proper sense. The defendants had the right to have submitted to the jury in an affirmative form each fact or group of facts which, standing alone, constituted a defense to any negligent act relied on by plaintiffs as a basis for recovery of damages, and the further right to have submitted any fact or group of facts which, standing alone, would reduce the amount of damages claimed by plaintiffs or show that no such damages were sustained at all. As the case was tried on special issues, such a group of facts could not be submitted in a single issue, but the court was required to submit each integral part of the group separately and apart from the others. These rules of decisions are well established by the following cases: M., K. & T. Ry. v. McGlamory, 89 Tex. 639, 35 S. W. 1058; St. L. S. W. Ry. v. Johnson, 100 Tex. 237, 97 S. W. 1039; Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517. And even the converse of issues affirmatively presented for plaintiff should be presented for the defendant. Gammage v. Gamer Co. (Tex. Com. App.) 213 S. W. 930.

[8] And in this connection it is to be remembered that there were several separate issues of negligence arising during the handling of the shipment by each connecting carrier, each of such issues constituting a cause of action within itself, and that those defendants would have the right as between themselves to apportion between them the total damages according to the liability of each as found by the jury.

We shall not undertake a discussion of the several special issues to which appellees objected on the ground noted. We deem it sufficient to say that under the decisions cited there was no error in their submission.

For the reasons noted, the judgment of the trial court is reversed and the cause is remanded.