**BARNES BROS. et al. v. INTERNATIONAL & G. N. R. CO. et al. (No. 824–4873.)**

Commission of Appeals of Texas, Section B. Jan. 4, 1928.

**1. Carriers ⬳230(13)—In action against railroad for injuries to and death of cattle in shipment, special findings of jury held too conflicting to serve as judgment basis.**

In action by a shipper of cattle against the railroad company for death of numerous cattle in shipment, special findings of the jury *held* too conflicting to serve as a basis for judgment.

**2. Trial ⬳358—Verdict conflicting on material issue will not support judgment, but is tantamount to mistrial.**

Where a verdict is conflicting on a material issue, it will not support a judgment, but is tantamount to a mistrial.

**3. Trial ⬳215—Court's submitting general charges as to defendant's liability held error, where cause was submitted on special issues.**

Court's submitting general charges in the nature of directions as to defendant's liability *held* error, where the cause was submitted on special issues.

**4. Appeal and error ⬳724(1)—Abstract error assignment, not making a specific ruling the basis of complaint, presents no ruling for review.**

An abstract error assignment, not making a specific ruling the basis of complaint and showing how complaint was injured thereby, presents no ruling for review.

Error to Court of Civil Appeals of Second Supreme Judicial District.

Action by Barnes Bros. and another against the International & Great Northern Railroad Company and others. A judgment for plaintiffs was reversed and the cause remanded by the Court of Civil Appeals (294 S. W. 349), and plaintiffs bring error. Judgment modified, and, as modified, affirmed.

Embry, Johnson & Tolbert, of Oklahoma City, Okl., J. A. Templeton, of Fort Worth, and White, Wilcox & Taylor, of Austin, for plaintiffs in error.

Garnett & Garnett, of Gainesville, and Terry, Cavin & Mills, of Galveston, for defendants in error.

SPEER, J. This is a damage suit instituted by plaintiffs in error against defendants in error to recover for injuries inflicted upon a shipment of cattle over the defendants' lines from points in Texas to Barnsdall, in the state of Oklahoma.

The case was tried upon special issues and a judgment entered for the plaintiffs in the sum of $3,305, which judgment was reversed in the Court of Civil Appeals and the cause remanded for another trial (Tex. Civ. App.) 294 S. W. 349. The case in this court turns upon the effect to be given the jury findings, and they are therefore set out in full.

"(1) Was the death of the steer at Crockett, Tex., on June 7, 1923, before loading on the cars, proximately caused by the negligence, if any, of the defendants, International & Great Northern Railroad Company? Answer 'Yes' or 'No.' No.

"(2) If you answer 'Yes,' then state what would have been the reasonable, market value of said steer at Barnsdall, Okl., had said steer been transported with ordinary care and dispatch from Crockett, Tex., and been dipped en route as the balance of the cattle were. Answer $———.

"(3) Were the cattle shipped from Crockett, Tex., injured or damaged by remaining in the pens at Crockett, for the length of time they did? Answer 'Yes' or 'No.' Yes.

"(4) Was the International & Great Northern Railroad Company guilty of negligence, which proximately caused said damage, in permitting said cattle to remain in the pens at Crockett for the length of time they did so remain? Answer 'Yes' or 'No.' Yes.

"(5) After the cattle in question were delivered to the International & Great Northern Railroad Company at Crockett and Grapeland, Tex., respectively, were they transported by said company with ordinary care and dispatch to Palestine, Tex.? Answer 'Yes' or 'No.' Yes.

"(6) If you answer 'No,' then were said cattle injured or damaged by their transportation from Crockett and Grapeland to Palestine, Tex.? Answer 'Yes' or 'No.' No.

"(7) Was said International & Great Northern Railroad Company guilty of negligence in permitting said cattle to remain at Palestine for the length of time they did so remain? Answer 'Yes' or 'No.' Yes.

---

⬳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"(8) Were said cattle injured or damaged by remaining at Palestine for the length of time they did? Answer 'Yes' or 'No.' Yes.

"(9) Were the cattle transported by the International & Great Northern Railroad Company from Palestine to Longview, Tex., with ordinary care and dispatch? Answer 'Yes' or 'No.' Yes.

"(10) If you answer 'No,' then were said cattle damaged or injured by their transportation from Palestine to Longview, Tex.? Answer 'Yes' or 'No.' No.

"(11) Were said cattle transported by the Texas & Pacific Railway Company from Longview to Fort Worth, Tex., with ordinary care and dispatch? Answer 'Yes' or 'No.' Yes.

"(12) If you answer 'No,' then were said cattle damaged or injured by their transportation from Longview to Fort Worth, Tex.? Answer 'Yes' or 'No.' No.

"(13) After said cattle arrived in Fort Worth over the Texas & Pacific on the evening of June 8, 1923, was there any unreasonable delay in switching the cars to the yards of the Fort Worth Stockyards Company, and unloading said cattle therein? Answer 'Yes' or 'No.' Yes.

"(14) If you answer 'Yes,' then were said cattle injured or damaged by such delay? Answer 'Yes' or 'No.' Yes.

"D. The uncontroverted evidence in this case shows that said cattle were dipped at Fort Worth under the supervision of a United States inspector of the Bureau of Animal Industry, and that any damages to said cattle caused by said dipping or any previous dipping, are not chargeable to any of the defendants; neither would any delay in the pens at Fort Worth caused by quarantine regulations be chargeable to them.

"(15) What was the condition and appearance of said cattle in the yards of the Fort Worth Stockyards Company at Fort Worth on the morning of June 9, 1923, and before they were dipped at Fort Worth? Answer: Fairly good.

"(16) At what hour on June 9, 1923, was the dipping of said cattle completed at Fort Worth? Answer: About 2:20 o'clock p. m.

"(17) After said cattle were dipped at Fort Worth, did they suffer damage or injury from remaining in the covered pens there until they were loaded and delivered to the Gulf, Colorado & Santa Fé Railway Company for transportation north towards their destination? Answer 'Yes' or 'No.' Yes.

"(18) How long a time, in the exercise of ordinary care, was required for the cattle to drip and dry under the covered pens at Fort Worth in June, 1923? Answer: Four hours.

"(19) Was the Gulf, Colorado & Santa Fé Railway Company, guilty of negligence, as that term has been hereinabove defined, in not moving said cattle from Fort Worth north sooner than it did? Answer 'Yes' or 'No.' Yes.

"(20) If you answer 'Yes,' then were said cattle damaged or injured thereby? Answer 'Yes' or 'No.' Yes.

"(21) What was the appearance and condition of said cattle when they arrived at Gainesville, Tex., en route to destination, on the morning of June 10, 1923? Answer: Fairly good.

"(22) Were the said cattle transported by the Gulf, Colorado & Santa Fé Railway Company from Fort Worth, Tex., to Shawnee, Okl., with ordinary care and dispatch? Answer 'Yes' or 'No.' Yes.

"(23) If you answer 'No,' then were said cattle damaged or injured by their transportation from Fort Worth, Tex., to Shawnee, Okl.? Answer 'Yes' or 'No.' No.

"(24) Were the defendants, or either of them, guilty of negligence, as that term has been defined, in unloading the cattle upon arrival in Shawnee into the pens in which they were unloaded? Answer 'Yes' or 'No.' Yes.

"(25) Were the defendants, or either of them, guilty of negligence, as that term has been defined, in keeping said cattle in the pens at Shawnee after they were unloaded there for the length of time they were so kept? Answer 'Yes' or 'No.' Yes.

"E. The uncontroverted evidence in this case shows that the flood prevailing in Arkansas City, Kan., on the afternoon of June 10, 1923, was unprecedented, and amounted to an act of God and prevented the Atchison, Topeka & Santa Fé Railway Company from transporting said cattle from Shawnee, Okl., to Arkansas City, Kan., over its own lines, and, for any delay in transporting said cattle on the Atchison, Topeka & Santa Fé line by reason of said flood, neither of the defendants would be liable in damages to plaintiffs.

"(26) When, if at all, did it become reasonably apparent to the Atchison, Topeka & Santa Fé Railway Company that it could not transport said cattle over its own line of railway from Shawnee, Okl., to Arkansas City, Kan.? Answer: About 5 p. m. June 10th.

"(27) When this became apparent, if it did become so, did the Atchison, Topeka & Santa Fé Railway Company exercise ordinary care, effort and diligence to divert said cattle and have them carried from said Shawnee over another railroad line to their destination? Answer 'Yes' or 'No.' No.

"(28) Upon arrival at Shawnee, Okl., at 6:45 p. m., June 10, 1923, 3 of said cattle were dead and some others were down in the cars, and when unloaded into said pens some of the cattle were reeling and staggering. What was the proximate cause of the death of said 3 head and the condition of the others mentioned on arrival at Shawnee? Answer: Dipping.

"(29) After said cattle were unloaded into the pens at Shawnee, on the next morning (June 11, 1923) at about 8 o'clock, 13 others of said cattle were found to have died in said pens. What was the proximate cause of the death of these 13 head of cattle? Answer: Dipping.

"(30) During the day of June 11, 1923, and after said 13 cattle had died in the pens, 22 more of said cattle died in the pens at Shawnee. What was the proximate cause of the death of said 22 head of cattle? Answer: Negligence.

"(31) How many, if any, of said cattle died as the proximate result of the negligence, if any, of the defendants? Answer: 22 head.

"(32) How many of said cattle, if any, died as the proximate result of having been dipped at Fort Worth, Tex., June 9, 1923, and in Houston county, Tex., prior thereto? Answer: 16 head.

"(33) What was the proximate cause of the condition of the remainder of said shipment upon arrival at Barnsdall, Okl., mile post 181, about noon on June 12, 1923? Answer: Bad.

"(34) If any of said cattle transported from Shawnee to Barnsdall were dead on arrival at Barnsdall or died soon after, then state how many. Answer: 4.

"(35) What was the proximate cause of their death? Answer: Negligence.

"(36) How many cattle were transported from Shawnee and delivered to plaintiffs at Barnsdall, and were placed on pasture there? Answer: 257.

"(37) What was the value per head of said cattle on arrival at Barnsdall in the condition they were? Answer: $15 per head.

"(38) What was the proximate cause of said cattle's condition upon arrival at Barnsdall? Answer: Dipping and delay.

"(39) What would have been the reasonable market value per head of said live cattle had they been transported with ordinary care and dispatch, had they arrived at Barnsdall in an uninjured condition, taking into consideration the unavoidable injuries, if any, necessarily incident to the transportation of cattle by rail for such distance, and the effect of the dippings, if any? Answer: $35 per head.

"(40) Did said cattle upon their arrival at Barnsdall appear to have been burned or poisoned as the result of dipping? Answer 'Yes' or 'No.' Yes.

"(41) If you answer 'Yes,' then state whether or not said cattle upon arrival at Barnsdall had any other apparent injuries except such as would have been the unavoidable and proximate result of shipment in cars by rail for such distance? Answer 'Yes' or 'No.' No.

"(42) Were the dippings the cattle received at Fort Worth June 9, 1923, and prior thereto in 1923, in Houston county, Tex., the proximate cause of their condition upon arrival at Barnsdall about noon on June 12, 1923? Answer 'Yes' or 'No.' Yes.

"(43) Were the cattle in question injured or damaged by reason of the dippings on May 24, 1923, and June 1st or 2d, and prior thereto in 1923, and at Fort Worth on June 9, 1923? Answer. 'Yes' or 'No.' Yes.

"(44) Were the cattle damaged or injured by being held in the pens at Shawnee from 6:45 p. m. June 10, 1923, until about 8:30 p. m. June 11, 1923? Answer 'Yes' or 'No.' Yes.

"(45) Were the defendants, or either of them, guilty of negligence, as that term has been defined, in unloading said cattle and holding them in the pens at Shawnee for the length of time next above stated? Answer 'Yes' or 'No.' Yes.

"(46) Are you able to determine from the evidence in this case what part of the damage, if any, was caused solely by the dippings in Houston county, Tex., prior to shipment in 1923 and the dippings at Fort Worth on June 9, 1923, from that part of the damage, if any, sustained by said cattle from being held in the pens at Shawnee from 6:45 June 10, until about 8:30 p. m. June 11, 1923? Answer 'Yes' or 'No.' Yes.

"(47) If you answer question No. 46 'Yes,' then state what part of said damage, if any, was proximately caused by the dippings said cattle received, and what part of said damage, if any, was caused by the holding of said cattle in the pens at Shawnee for the time stated. Answer: Proximately one-half by dipping and one-half by negligence on part of defendants.

"(48) How many head of said cattle died while in transit? Answer: 42 head.

"(49) What would have been the reasonable market value of said dead cattle had they been transported with ordinary care and dispatch and had they arrived at Barnsdall in an uninjured condition, taking into consideration the unavoidable injuries, if any, necessarily incident to the transportation of cattle by rail for such distance and the effects of dipping, if any? Answer: $35.

"You are the sole judges of the facts proved, of the weight to be given to the evidence and of the credibility of the witnesses. The form of your verdict will be as follows: 'In answer to the above questions submitted to us, we have written our answers thereto, as above stated, and we so find for the plaintiff in the sum of $3,305.'"

The Court of Civil Appeals reversed the judgment because in its opinion the findings were in such conflict as not to authorize any judgment; the gist of the holding being in these words:

"Manifestly the findings of the jury were uncertain and indefinite in many material respects, and in other material respects hopelessly conflicting."

Upon the coming in of the verdict, the plaintiffs moved for judgment thereon in the sum of $6,050. This motion was overruled, and, as above shown, judgment was entered for the sum of $3,305.

Plaintiffs in error present the case upon three assignments of error.

The first attacks the judgment. of the Court of Civil Appeals, embraced in its holding that—

"Manifestly the findings of the jury were uncertain and indefinite in many material respects, and in other material respects hopelessly conflicting, and therefore wholly insufficient to serve as a proper basis for the judgment rendered. Those conflicts in the findings upon the issue of the proximate cause of the injuries to the cattle become more apparent in view of the great preponderance of the evidence tending to show that practically all of the injuries suffered by the cattle were the result of arsenic poison in the solutions in which they were dipped. And the assignments of error presenting those contentions must be sustained."

[1, 2] We quite agree with the Court of Civil Appeals in its conclusion that the findings as returned by the jury are in such state of conflict as to be wholly insufficient to serve as a proper basis for the judgment rendered. It is sufficient at this point to note the findings upon issues 42 and 43, to the effect that the dippings to which the cattle had been subjected were the proximate cause of the injuries to the cattle, and, on the other hand, the findings upon issues 44, 45, and 38 to the effect that the negligence of the company in unloading and holding the cattle in the pens at Shawnee was the proximate cause of their injuries. In our consideration of this question of conflict, we have eliminated a number of answers to issues which we deemed to be purely evidentiary, and therefore not material, but, after such elimination, we are unwilling to hold that there is no conflict between the findings noted as to the issue of proximate cause. The jury itself, upon the

whole findings, appear to have been very much confused, and their verdict lacks that definiteness essential to support a judgment the one way or the other. It is needless to cite authorities to the proposition, which is not denied by plaintiffs in error, that, where a verdict is conflicting upon a material issue, it will not support a judgment, but is tantamount to a mistrial. The holding of the Court of Civil Appeals was right.

Next, it is complained that "the Court of Civil Appeals erred in overruling plaintiffs in error's cross-assignments of error and in holding that the trial court did not commit error against said plaintiffs in error in giving to the jury the general instructions complained of in said assignments, notwithstanding the case was submitted on special issues."

There were several cross-assignments presented in the Court of Civil Appeals relating to different rulings, and this assignment would therefore be too general to merit consideration were it not for the fact it limits the complaint to the point that the trial court had wrongfully submitted general instructions inapplicable to the method of submitting a case as this one was upon special issues. The trial court submitted the following instruction:

"The uncontroverted evidence in this case shows that said cattle were dipped at Fort Worth under the supervision of a United States inspector of the Bureau of Animal Industry, and that any damages to said cattle caused by said dipping or any previous dipping are not chargeable to any of the defendants; neither would any delay in the pens at Fort Worth caused by quarantine regulations be chargeable to them."

And again he instructed the jury:

"The uncontroverted evidence in this case shows that the flood prevailing in Arkansas City, Kan., on the afternoon of June 10, 1923, was unprecedented, and amounted to an act of God and prevented the Atchison, Topeka & Santa Fé Railway Company from transporting said cattle from Shawnee, Okl., to Arkansas City, Kan., over its own lines, and, for any delay in transporting said cattle on the Atchison, Topeka & Santa Fé line by reason of said flood, neither of the defendants would be liable in damages to plaintiffs."

[3] The plaintiff in the case timely objected to these charges, upon the ground, among others, that, the cause having been submitted upon special issues, it was error to submit such general charges, and such objections should have been sustained. The instructions given are not the ordinary definition and explanation of terms used in the charge within the meaning of the statute permitting explanations and definitions, but are in the nature of a general direction as to the defendant's liability. See T. & N. O. Ry. Co. v. Harrington (Tex. Com. App.) 235 S. W. 188;

Connellee v. Nees (Tex. Com. App.) 266 S. W. 502; South Chester Tube Co. v. Texhoma, etc., Co. (Tex. Civ. App.) 264 S. W. 108.

The next and last assignment of error is:

"The Court of Civil Appeals erred in holding that in this case submitted on special issues 'the defendant had the right to have submitted to the jury, in an affirmative form, each fact or group of facts which, standing alone, constituted a defense to any negligent act relied on by the plaintiff as a basis for the recovery of damages, and the further right to have submitted any fact or group of facts which, standing alone, would reduce the amount of damages claimed by plaintiffs, or show that no such damages were sustained at all.' "

[4] This assignment presents no ruling of the Court of Civil Appeals for review. It is a mere abstraction. The language quoted from the Court of Civil Appeals is that of reasoning in support of some ruling. But in what respect it injured plaintiffs in error is not shown. In other words, no specific ruling is expressly or impliedly made the basis of complaint. In a general way, the principle announced in the quotation is accurate and finds support in the decisions of the Supreme Court. See Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517.

We conclude that the judgment of the Court of Civil Appeals should be so modified as to sustain plaintiffs in error's cross-assignments complaining of the general charges given, and, as thus modified, that the judgment of reversal and remanding be affirmed. The plaintiffs in error, however, should recover the costs of the Supreme Court.

CURETON, C. J. Judgment of the Court of Civil Appeals affirmed, as recommended by the Commission of Appeals.